UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA :

v. : Case No.: 8:26-CR-285-KKM-SPF-1

RAED YOUSEF :

**DEFENDANT RAED YOUSEF'S**
**MOTION FOR PRETRIAL RELEASE**

COMES NOW, undersigned counsel, on behalf of the Defendant, RAED YOUSEF, pursuant to Title 18 United States Code Section 3142(a), and files this his motion and memorandum of law for pretrial release and in support states as follows:

I. Procedural History

On Tuesday, September 15, 2026, the grand jury returned a nineteen-count sealed indictment against the Defendant.

On Wednesday, September 15, 2026, the Defendant was arrested.

On Wednesday, September 16, 2026, the indictment was unsealed, and the Defendant made his first appearance.[1]

[1] As the Defendant had not yet retained undersigned counsel, undersigned counsel appeared as a 'friend of the court' while the court advised the Defendant of his rights.

The Defendant's detention hearing and arraignment were both bound over for Friday, September 18, 2026.

On Friday, September 18, 2026, the Defendant was arraigned.

The Defendant's detention hearing is scheduled for Wednesday, September 23, 2026, at 2:00 pm.

The Defendant is scheduled for a pretrial conference on October 13, 2026, and a trial on November 2, 2026.

The Defendant has been in continuous United States Marshal custody at the Pinellas County Jail since his arrest on Tuesday, September 15, 2026.

## II. The Bail Reform Act of 1984

The Bail Reform Act of 1984 is chapter I of the Comprehensive Crime Control Act (CCCA) of 1984. The provisions of the Bail Reform Act of 1984 were transplanted from an earlier Senate Bill, S. 1762. The legislative history of the Bail Reform Act of 1984 is the report prepared in connection with S. 1762 (S. Rep. No. 225, 98th Congress, 1st Session (1983)). The Bail Reform Act of 1984 repealed the most recent major revision to federal bail law, the Bail Reform Act of 1966 (18 U.S.C. Sections 3141-51 – Repealed). The goal of the changes in the law regarding bail were aimed at those individuals who committed new crimes while on release and the danger those individuals pose to others if released.

18 U.S.C. Section 3142 governs the release or detention of a defendant pending trial. Rule 5 of the Federal Rules of Criminal Procedure governs the first court appearance for a defendant charged with a federal offense. This is commonly referred to as a federal defendant's first appearance. The most important aspect of this hearing is to address the issue of release or detention. Any judicial officer authorized to order an arrest under 18 U.S.C Section 3041 may conduct a detention hearing, although typically a detention hearing is handled by a United States Magistrate Judge.

At the initial appearance, there are five dispositions the court can make as to release or detention:

- Order temporary detention. If the case is one that qualifies for temporary detention under the statute, the court must so order. 18 U.S.C. Section 3142(d).
- Conduct a detention hearing. 18 U.S.C. Section 3142(e).
- Continue the case three to five days upon a motion for a detention hearing, while the defendant remains in custody. 18 U.S.C. Section 3142(f).
- Order the defendant's release on his personal recognizance bond or an unsecured appearance bond. 18 U.S.C. Section 3142(b).
- Set other conditions of release. 18 U.S.C. Section 3142(c).

In the instant case, the Defendant was ordered temporarily detained at his first appearance on September 16, 2026, and again at his arraignment on September 18, 2026. Ultimately, after the above delays, a detention hearing was scheduled for September 23, 2026.

III. Pretrial Release Factors to Be Considered

Pursuant to 18 U.S.C. Section 3142(g) there are four factors that should be considered when determining whether there are conditions of release that will reasonably assure the appearance of a person as required and the safety of any other person and the community. These four factors are:

- The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device; and
- The weight of the evidence against the person; and
- The history and characteristics of the person, including –
    - the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

  - whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state or local law; and

- The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

IV. If the Court Orders Release

Unless the court orders a person detained under 18 U.S.C. Section 3142(e) and (f), it must set conditions of release that a defendant can meet. 18 U.S.C. Section 3142(b) and (c). The court's objective is to always set conditions of release that will "reasonably assure the appearance of the person as required" and the "safety of any other person and the community". 18 U.S.C. Section 3142(b) and (c).

Once pretrial release is determined appropriate there is a presumption in favor of release of a defendant under the least restrictive possible conditions. 18 U.S.C. Section 3142(b).

There are three types of conditions of release:

- *Personal recognizance*: A personal recognizance release means a defendant promises to appear to all court appearances and to not commit crimes while on release. 18 U.S.C. Section 3142(b).

- *Unsecured appearance bond*: This adds one element to the personal recognizance release, in that, if a defendant does not appear as directed the court may enter a judgment against him in the amount set in the bond however a defendant need not initially post that amount or any portion of it before he is granted release. 18 U.S.C. Section 3142 (b).
- *Other:* If a release on personal recognizance or unsecured appearance bond will not reasonably assure appearance and safety, then the court must turn to the catalog of conditions as set forth in 18 U.S.C. Section 3142 (c)(1). These conditions vary from simply maintaining employment to weekly drug testing to no contact with victims or witnesses to supervision by a third-party custodian to an agreement to forfeit property or a surety (monetary) amount[2] to house arrest with a monitor among other special conditions.

V. Importance of Pretrial Release

Pretrial release is important to a federal defendant facing trial for the following reasons:

- it permits a defendant - who is innocent until proven guilty - to remain at liberty while awaiting trial; and

[2] It should be noted that a judicial officer shall not impose a financial condition that results in the *de facto* pretrial detention of a person. 18 U.S.C. Section 3142(c)(2). The pretrial detention provisions of 18 U.S.C. Section 3142 replaced the existing practice of detaining defendants through the imposition of an excessively high money bond. S. Rep. No. 225, *supra* note 9, at 16.

- it allows a defendant to maintain family and employment ties and the emotional strength to withstand the rigors of being an accused in the federal criminal justice system; and
- it provides undersigned counsel with unrestricted access to a defendant while preparing his defense without the burden of jail visits that are both intrusive and cumbersome in terms of interaction and travel time; and
- it allows a defendant to enter and leave the courtroom during trial without potentially being observed by the jury wearing shackles and being escorted by the deputy marshals assigned to his guard; and
- it enhances the potential for release pending appeal in the event of a conviction at trial or by plea by establishing a record of court appearances; and
- it increases the chances that a defendant will be permitted to self-report to an institution in the event of a conviction and sentence of imprisonment; and
- because the Defendant is suffering from medical conditions, it is better off treated with private insurance in a private setting rather than county taxpayer expense in a county jail.

## VI. Legal Analysis

In the instant case, there are conditions, or a combination of conditions, of release that can be set in this case that will reasonably assure the safety of other persons and the community. 18 U.S.C. Sections 3142(a)(2), (c).

Under a pretrial detention analysis, arguendo, the Defendant's request for pretrial release will largely fall, as it almost always does, on whether the Defendant is determined to be a risk of flight or a danger to the community.

*Danger to the Community – Clear and Convincing Evidence*

Pursuant to 18 United States Code Section 3142(f) and confirmed by the Supreme Court of the United States in *United States v. Salerno*, 481 U.S. 739 (1987), the government must prove the Defendant is a danger to the community by clear and convincing evidence. Clear and convincing evidence means more than a preponderance of the evidence but less than beyond a reasonable doubt – commonly referred to as proof to "a high degree of certainty." *United States v. Quartermaine*, 913 F.2d 910 (11th Cir. 1990).

The government cannot prove by clear and convincing evidence that the Defendant is a danger to the community because the Defendant is not a danger to the community. The Defendant has minimal criminal history, and what he does have occurred decades ago. In this case, the Defendant, in the light most favorable to the government, inflamed by passions of a hot button topic with legitimate

political (non-violent) disagreements by many sides of the political spectrum, provided a miniscule amount of money to someone he should not have. The consequences of his actions were severe and pronounced – arrest, incarceration, and the threat of decades behind bars if convicted and sentenced to the statutory maximum. The Defendant has been chastened and humbled by the events of the past week.

*Risk of Flight – Preponderance of the Evidence*

18 United States Code Section 3142(f) is silent on the burden of proof for the government to prove risk of flight, so the Eleventh Circuit Court of Appeals and courts have applied the ordinary pretrial standard of preponderance of the evidence. *United States v. Quartermaine*, 913 F.2d 910 (11th Cir. 1990). Quartermaine relies on *United States v. King*, 849 F.2d 485 (11th Cir. 1988). The *King* court explained in a footnote that Section 3142(f), which sets the clear-and-convincing standard for dangerousness but is silent on flight, that the government must prove risk of flight by a preponderance of the evidence. *United States v. King*, 849 F.2d 485 (11th Cir. 1988).

In the instant case, the government cannot prove the Defendant is a risk of flight by a preponderance of the evidence because the Defendant is not a risk of flight. The Defendant has no passport. Both his United States of America and Jordan passports were seized by the government. He is willing to subject himself to

the strictest home confinement terms. And various family members and friends are offering their homes as collateral, for which they would become homeless if the Defendant did not appear for court as scheduled and fled.

-----

However, in the interest of caution, in the next section, the Defendant sets forth analysis and legal argument under all the factors set forth under 18 U.S.C. Section 3142(g).

*The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device*

The Defendant's case does not allege a minor victim or controlled substance, firearm, explosive, or destructive device. It does not allege a sexual crime or sexual crime against children.

The Defendant's case, by extrapolation, does allege a federal crime of terrorism, but it is not an alleged act of direct terrorism against the United States of America. The case stems on the proposition that the Defendant knowingly and willfully donated money, as set forth in the indictment approximately $11,000, to a group designated by the United States as a state-sponsored terrorist group.

In the light most favorable to the government, assuming arguendo this is accurate, and the Defendant is not conceding it is, $11,000 or just under $50,000 is not monetarily significant enough to affect the mission it was intended to aid. It

instead demonstrates a person caught up in the heat of political passion with a real-life financial inability to make any meaningful difference, or any difference at all, in the cause he seeks to aid.

*The weight of the evidence against the person*

The weight of the evidence is still developing from a defense perspective, although it is somewhat predictable that the government will argue the weight of the evidence is strong.

However, there is case law, albeit from the Ninth Circuit, that has held that this is the least important factor in determining pretrial release and the Defendant urges this court to hold the same. *United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985).

A deeper analysis of the indictment[3], isolating the alleged criminal conduct of the Defendant, aside from the alleged criminal conduct of co-conspirators 1, 2, and 3 results in a far more nuanced view of the evidence against the Defendant that is available as of the filing of this pleading.

All the quotes below are in chronological order.

1. On or about November 5, 2023: Yousef warned Co-Conspirator 3 to "be very careful, be careful of those messages" and to "delete them, I mean, one by one [as you send]. If you are chatting with anybody, or if you are sending anything, especially for that 'bread' thing. Be careful." (Page 20.)

[3] The indictment states the quoted excerpts were translated from Arabic to English by a linguist (SEALED INDICTMENT at 17).

The government interprets this statement as the Defendant attempting to hide that he was in a criminal conspiracy. An alternative reading could be the Defendant telling co-conspirator 3 that he was not going to be part of the 'bread thing' because he was not going to engage in criminal activity in a criminal conspiracy. Co-conspirator (French Organization) 1 "purports to provide financial, material, and physical aid to those in Africa and the Middle East" (Page 2). The Defendant donated to that organization's PayPal account (Page 21) - the profile of a person giving to a humanitarian nonprofit, not to a clandestine terror cell.

2. On or about January 30, 2024: After sending $957.19 to the PayPal account associated with Co-Conspirator 1, Yousef told Co-Conspirator 3 that "it worked" and that he sent $1,000 to Co-Conspirator 1. (Page 21.)

The government this statement as proof the Defendant was in a criminal conspiracy. An alternative explanation is the Defendant donated money to a charitable cause. Regardless of your political position on the war in Gaza, it is not disputed that thousands of innocent civilians desperately need food and shelter. The Defendant was recruited and guided by others. He did not originate the scheme. Co-Conspirator 3 "recruited potential donors, including [Yousef]" (Page 18), sent him the account information (Page 18), and walked him through how to use PayPal (Page 21). The Defendant is a follower relying on others' representations, not an architect with independent knowledge of where his money ultimately went.

3. On or about January 30, 2024: Yousef told Co-Conspirator 3 to "tell people ah ... to distribute … don't talk about the … other things like the bread and such. Just tell them these are needy people in Gaza, and these are people who can deliver. That would be better, because a lot of people will be afraid when you tell them … I mean, they don't want to get in trouble, okay?" (Page 21.)

The government interprets this statement as the Defendant attempting to hide that he was in a criminal conspiracy. An alternative reading could be the Defendant telling 3 that he was not going to be part of the 'bread and such' because he was not going to engage in a criminal conspiracy and was focused on the humanitarian needs of his fellow humans in need. The representations made to him described humanitarian relief. Co-Conspirator 2 told the group that "[a] portion of what we receive goes to the children, to the displaced, and those who are in bad need" (Page 19). Co-Conspirator 3 described the mechanism to others as transferring "to a

charitable organization" (Page 24). A donor, such as the Defendant, hearing this framing could reasonably believe he was funding relief for displaced civilians.

4. On or about April 25, 2024: Yousef told Co-Conspirator 3 that "[b]y God, those - those - Jews are brutal - I mean - after Gaza - er - er - they are going to turn their sight on the West Bank - they are saying - May God take revenge against them - and let us see the day they get what they deserve." (Page 22.)

The Defendant's own instructions emphasized the humanitarian framing. When discussing soliciting others, the Defendant told Co-Conspirator 3 to "tell them these are needy people in Gaza, and these are people who can deliver" (Page 21) - and, notably, to *not* talk about "the bread and such." That is consistent with a person who understood the enterprise as aid to needy Gazans and was uncomfortable with the euphemism's others used.

The Defendant's angry remarks about Israelis are emotionally charged, but protected, political speech reacting to the Gaza war. They show heated opinion, not proof that he knew his specific PayPal donations reached Hamas' military wing. Political and religious expression, however offensive, is not the same as intent to fund a designated organization. The First Amendment to the United States Constitution guarantees this right.

5. On or about August 23, 2024: Recounting a conversation with Co-Conspirator 2, Yousef told Co-Conspirator 3 that Co-Conspirator 2 "knows the people over there, in the ah … ah … I told him, I told him let them then cut off heads and show the whole world, like what the fucking Jews are doing to us over there, but he didn't do anything you know. You see, you need to frighten them and scare them so they can flee from our land man! Then after they hit them, they need to behead them and show that on, ah on ah … social media, so they can be frightened and scare them to death." (Page 22.)

The Defendant was a habitual charitable giver, not a member of a criminal conspiracy. Co-Conspirator 3 acknowledged to the Defendant: "You told me that you provide … to other organizations" (Page 20) - evidence the Defendant routinely donated to humanitarian and charitable causes and treated this yet one more.

The Defendant's angry remarks about Israelis are emotionally charged, but protected, political speech reacting to the Gaza war. They show heated opinion, not

proof that he knew his specific PayPal donations reached Hamas' military wing. Political and religious expression, however offensive, is not the same as intent to fund a designated organization. The First Amendment to the United States Constitution guarantees this right.

6. On or about August 23, 2024: Yousef told Co-Conspirator 3 that people need to be slaughtered; they need to be slaughtered, to behead them and display their heads. One would hold their heads, one in this hand and another head in the other hand and display their heads to frighten them so that they leave our land, man …. We need to fuck them up, you know! This is bullshit that one keeps saying take it easy, actually you need to scare those people. Those, those people are frightened Okay! You need to frighten them and fuck them up until they leave our land. (Pages 22 and 23.)

The government through its indictment concedes at least some of the money entered a humanitarian channel. The indictment admits Hamas' social wing "operates as a social welfare agency providing food, medical care, and education" and that funds "collected under humanitarian banners" are only later "routed to military and operational use" (Page 4). This concession is exculpatory: it shows the funds were solicited and presented under a humanitarian banner, exactly as an unwitting donor, like the Defendant, would perceive them, and that the diversion to military use happened downstream and outside the Defendant's knowledge.

The Defendant's angry remarks about Israelis are emotionally charged, but protected, political speech reacting to the Gaza war. They show heated opinion, not proof that he knew his specific PayPal donations reached Hamas' military wing. Political and religious expression, however offensive, is not the same as intent to fund a designated organization. The First Amendment to the United States Constitution guarantees this right.

7. On or about August 23, 2024: Yousef told Co-Conspirator 3 that after the death of Hanniyah, may God have mercy on his soul, Al-Sinwar took over and began to carry out martyrdom operations in Tel Aviv, here and there, where he began to send them. Kindness doesn't work with those Israelis; they don't, and you need to be very, very tough with them, the same way they are treating you, very tough, meaning you have to be very tough too. You have to cut off heads, cut them apart, meaning make one with those assholes. (Page 23.)

The Defendant's conduct was not that of someone hiding a known crime or participating in a criminal conspiracy. Yousef sent modest sums through PayPal - a traceable, name-attached mainstream payment platform (Page 21 and 24) - rather than the anonymized cryptocurrency methods the indictment describes as Hamas' preferred untraceable channel (Page 11). A person who knew he was funding terrorism would be expected to use the anonymous rails, not his own PayPal account. It is non-sensical to believe otherwise.

The Defendant's angry remarks about Israelis are emotionally charged, but protected, political speech reacting to the Gaza war. They show heated opinion, not proof that he knew his specific PayPal donations reached Hamas' military wing. Political and religious expression, however offensive, is not the same as intent to fund a designated organization. The First Amendment to the United States Constitution guarantees this right.

8. On or about May 21, 2025: Yousef told Co-Conspirator 3 that because he was traveling, he locked his messages with Co-Conspirator 2 as he "was afraid they would ask me questions about this, you know at the airport. For him I did a locked message, there are locked messages nobody can see them, I mean unless you put a code." (Page 26.)

Inflammatory statements reflect wartime anger, not knowledge of the criminal conspiracy's money trail. The Defendant's angry remarks about Israelis (Page 22 and 23) are emotionally charged, but protected, political speech reacting to the Gaza war. They show heated opinion, not proof that he knew his specific PayPal donations reached Hamas' military wing. Political and religious expression, however offensive, is not the same as intent to fund a designated organization. The First Amendment to the United States Constitution guarantees this right.

*Summary*

There is an alternative reading of the indictment that shows the Defendant donated money to what he thought was a group designating money for charitable causes in Gaza – and not to Hamas - and made intemperate statements about the people of Isreal, but ultimately was an unsophisticated, emotionally invested donor who believed - based on how the enterprise was packaged and described to him - that he was funding humanitarian relief for civilians in Gaza, and who never knew his contributions were diverted to Hamas.

The government's knowledge evidence – 'bread' and 'true men' - is based upon an interpretation of each, but at this point each word can be recast as ambiguous conduct consistent with an innocent, if naive, humanitarian motive.

*The history and characteristics of the person, including –the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings*

The history and characteristics of the Defendant trend positive. The Defendant is a United States citizen, will reside with his wife and adult son in Lutz, Florida, has strong extended family and business ties to the Tampa Division of the Middle District of Florida, and has surrendered his Jordan and United States of America passports to federal authorities.

<u>Personal and Family History</u>

Raed Yousef was born on January 15, 1970, in Kuwait to Fatima and Mohammed Yousef. He has one brother and four sisters. Raed lived with his parents in Kuwait until approximately age three, when his father moved to the United States and settled in New York. His father initially supported himself by selling clothing to customers while Raed, his mother, and his siblings relocated to Jordan. Raed's mother had several female friends in Jordan whose husbands, like hers, had moved elsewhere for employment, providing her with a community of women in similar circumstances.

Raed spent approximately the next ten years in Jordan. His mother did not work outside the home and was responsible for raising the children, while his father sent money from the United States to support the family. Their circumstances were modest, but Raed recalls having the necessities of life, including adequate food, clothing, and shelter.

When Raed was approximately thirteen years old, he, his mother, and his siblings joined his father in New York, New York. The family lived together in a three-bedroom apartment in the Bronx, and Raed recalls that their circumstances improved after the move. His adjustment to the United States was relatively easy. He had already learned some English while living in Jordan and was enrolled in English as a Second Language classes after arriving in New York.

Around 1989, Raed's father sold the bodega he owned in New York and moved the family to Bradenton, Florida. The move offered warmer weather and a new business opportunity, and one of Raed's paternal uncles was already living in Bradenton. His father purchased a convenience store there, establishing the family's connection to the Tampa Bay area that has continued for more than three decades.

Raed married his wife, Buthaina, on March 25, 1990. During the two years preceding their marriage, Raed traveled to Palestine to visit Buthaina to court her.

Raed's brother subsequently married Buthaina's sister, further connecting the two families. Raed and Buthaina have been married for more than 36 years.

Raed and Buthaina made their home in Bradenton for approximately 29 years and raised their family there. In 2018, they moved to Lutz, Florida, where Raed continues to reside. Raed owns the home he shares with his wife and one of their adult sons. Their other surviving adult son also lives in Lutz, and their two adult daughters live in Tampa. Raed maintains daily contact with his children.

Family remains an important part of Raed's life. Raed, his wife, and their children ordinarily gather every weekend for a family dinner. Raed and his sons enjoy cooking outdoors on the barbecue, while Buthaina also prepares food for the large family meals. They regularly spend time with Raed's mother and other members of their extended family.

Raed and Buthaina raised their children in the Muslim faith. At the time, theirs was the only Muslim family in the immediate area, which occasionally presented difficulties when others did not understand their faith or traditions. Raed nevertheless encouraged his children to make friends broadly, learn about other cultures, and appreciate the diversity of the community they lived in.

Raed's children remember their father as protective and consistently involved in their lives. He emphasized education, achievement, independence, and the importance of working toward a secure future. They describe him as someone

who was present when they needed him and who made the needs and well-being of his family a priority.

The Yousef family experienced an extraordinary tragedy in September 2015, when two of Raed's sons were murdered during a robbery of the family's convenience store, *the Snappy Mart*, in Bradenton. At the time of the robbery and murders, Khasem Yousef was 23 years old and Faares Yousef was 17 years old. Raed described Khasem as his "right-hand man" and Faares as his "best friend." The deaths of the two young men had a profound effect on Raed, his wife, and their surviving children. Raed describes the loss as having taken much of the happiness from their home and as a tragedy from which the entire family has continued to suffer.

Raed's father died in 2012. His mother divides her time between Palestine and the United States and resides with Raed when she is in the United States. Raed's older brother resides in Tampa, although he is presently in Palestine and expects to return in approximately six weeks. Two of Raed's sisters also live in Tampa, another lives in Louisiana, and his remaining sister lives in Saudi Arabia. Raed and his family regularly spend time with his mother and other extended family members.

On February 22, 1991, Raed became a naturalized citizen of the United States, an accomplishment in which he takes considerable pride. He has spent most of his life in the United States and virtually his entire adult life in Florida.

If released, Raed can return to the Lutz home he owns and shares with his wife and adult son. Alternatively, his other adult son, who also resides in Lutz, is willing to have Raed reside with him if the court considers a separate residence is appropriate. That son is willing to serve as Raed's third-party custodian and to have Raed remain in his home subject to location monitoring or other restrictions imposed by the court.

*Analysis*

Raed's personal and family history demonstrates unusually longstanding ties to both the United States and the Tampa Bay (Tampa Division of the Middle District of Florida) community. He came to this country at approximately age thirteen, later became a naturalized United States citizen, and has lived in the Tampa Bay area since approximately 1989. He has therefore spent nearly four decades in this community and virtually his entire adult life in the Middle District of Florida, Tampa Division.

Those ties extend well beyond residence alone. Raed has been married to Buthaina for more than 36 years, owns his home in Lutz, and has four surviving adult children who all reside in the Tampa Bay area. He maintains daily contact

with his children, and the family continues to gather for meals each weekend. His mother lives with him during the portion of each year she spends in the United States, while his brother and two of his sisters also reside in Tampa. His family relationships are therefore both longstanding and geographically concentrated in the community to which he would return if released.

Raed's relationship with his children further demonstrates the depth of those ties. He was actively involved in raising them, emphasized education and independence, and remained closely engaged in their daily lives. That involvement has continued into their adulthood. The family's experience following the murders of Khasem and Faares in 2015 also underscores the importance of these relationships. The surviving family endured an extraordinary loss together and has remained closely connected in the years since.

These circumstances are directly relevant to the court's consideration of Raed's family ties, length of residence, and community ties under 18 U.S.C. § 3142(g)(3)(A). His connections to this community were established over decades and long predate the present case. His home, wife, children, mother when she is in the United States, siblings, and much of his adult history are centered in the Tampa Bay area.

There is also a concrete and workable release plan. Raed can reside in the home he owns with his wife and adult son, or, if the court considers an alternative

residence preferable, with his other adult son in Lutz. Raed's wife and both of his sons are willing to assume responsibility as third-party custodians and accommodate location monitoring and restrictions on Raed's movement. The availability of two stable residences also gives the court flexibility in fashioning appropriate conditions.

Raed's family circumstances therefore provide more than generalized assurances that he will remain in the community. He has a permanent residence, decades of continuous ties to the area, a spouse of more than 36 years, four adult children living nearby, substantial extended family connections, and a son willing to assume specific responsibilities for his supervision and appearance. Those circumstances provide identifiable anchors to the community as well as practical ways through which conditions of release can be implemented and monitored.

Educational History

Raed attended John F. Kennedy High School in the Bronx, New York, where he completed his secondary education. He recalls having no academic or disciplinary difficulties and graduated with an A average. In addition to performing well academically, Raed participated in several sports, including football, soccer, and weightlifting. He did not pursue additional formal education after graduating from high school and instead followed his father's entrepreneurial footsteps by running multiple businesses.

*Analysis*

Raed's educational history reflects a successful adjustment to life in the United States following his arrival from Jordan at approximately age thirteen. Although English was not his first language, he enrolled in ESL classes after arriving in New York and went on to perform well academically, graduating from high school with an A average while also participating in organized athletics.

His education is relevant to the larger consideration of his history and characteristics under 18 U.S.C. § 3142(g)(3)(A). Although Raed did not pursue college or other formal education after high school, his record reflects academic success, participation in structured activities, and the ability to adapt successfully to a new country and educational environment.

## Work History

Raed has been self-employed since 1998. For approximately 28 years, he has owned and operated beauty supply stores through *Toms Enterprises USA, LLC*. He presently owns six stores, including locations in Bradenton, Florida and two stores in Tampa, Florida.

Raed's businesses are family enterprises, and members of his family assist him in their operation. The stores also employ several individuals from the local community who rely upon their employment for income. Raed has therefore spent

most of his adult working life operating businesses in the same Tampa Bay communities in which he has lived and raised his family.

Raed pays business taxes as scheduled.

*Analysis*

Raed's employment history provides another significant indication of his longstanding connection to the community. He has been continuously self-employed since 1998 and has spent approximately 28 years developing and operating local businesses. His livelihood, business interests, and professional responsibilities are firmly established in the Tampa Bay area.

Section 3142(g)(3)(A) specifically identifies employment among the history and characteristics the Court should consider in determining appropriate conditions of release. Raed's circumstances reflect considerably more than the existence of a current job. He owns six established businesses, works with members of his family in their operation, and employs individuals from the surrounding community. Those businesses represent substantial economic and professional ties accumulated over nearly three decades.

Raed's employment circumstances also provide structure and responsibilities he can return to if he is released, subject to whatever restrictions the Court determines are appropriate. His businesses, employees, and family members

involved in their operation give him ongoing obligations within the community and further reinforce the substantial ties reflected elsewhere in his personal history.

When considered with his lengthy residence in the Tampa Bay area, home ownership, marriage of more than 36 years, and extensive family connections, Raed's nearly three decades of continuous self-employment provide an additional and concrete anchor to the community relevant to the Court's assessment under § 3142(g).

Physical Health

Raed was diagnosed with Type 2 diabetes at approximately age 40. For years, he required several medications to manage the condition. In 2025, he underwent gastric sleeve surgery and subsequently lost approximately 80 to 100 pounds. His overall health improved substantially following the surgery, as did the management of his diabetes. He presently takes metformin as needed.

Raed also has sleep apnea and requires the use of a CPAP machine while sleeping. Aside from his diabetes and sleep apnea, he has no other adverse health conditions.

*Analysis*

Raed's physical health is generally good, especially following the substantial weight loss and improvement he experienced after gastric sleeve surgery. His Type

2 diabetes nevertheless remains a chronic medical condition requiring continued attention, and his sleep apnea requires regular access to a CPAP machine.

Raed's physical condition is among the history and characteristics the Court may consider under 18 U.S.C. § 3142(g)(3)(A). His medical conditions do not appear to limit his ability to function independently or meet the requirements that could accompany pretrial release. He has successfully managed his diabetes for many years and took a significant step toward improving his health when he underwent gastric sleeve surgery in 2025, subsequently losing approximately 80 pounds.

Raed's medical history presents identifiable but manageable healthcare needs. If released, he would be able to return to his established home and continue managing his diabetes and sleep apnea while complying with the conditions imposed by the court.

<u>Mental Health</u>

Raed has never been diagnosed with a mental health condition and has no history of mental health treatment or counseling. Other than sadness deriving from the loss of his two murdered sons, he does not presently believe that he is experiencing any mental or emotional difficulties requiring treatment.

*Analysis*

Raed's mental and emotional health history presents no identified concerns. He has no known history of mental illness, psychiatric treatment, or other mental health difficulties.

Mental condition is among the history and characteristics considered under 18 U.S.C. § 3142(g)(3)(A). Based upon the available information, there is nothing in Raed's mental health history suggesting a condition that would impair his judgment, interfere with his ability to follow instructions, or otherwise hinder his ability to comply with conditions imposed by the court.

Alcohol and Substance Use

Raed has no history of alcohol or illegal drug use. As a practicing Muslim, his faith prohibits the consumption of alcohol and the use of illegal drugs. Consistent with those beliefs, Raed has never consumed alcohol or used or experimented with illegal drugs at any point in his life. He thus has never required substance abuse treatment or counseling.

*Analysis*

Raed's substance use history presents no identified concern. At age 56, he has never consumed alcohol or experimented with or used illegal drugs. His lifelong abstinence is consistent with the religious principles he has lived by.

Substance use history is among the factors the court may consider as part of Raed's history and characteristics under 18 U.S.C. § 3142(g)(3)(A). In Raed's case,

there is no history of substance abuse, impaired behavior associated with alcohol or drugs, or need for substance abuse treatment.

Accordingly, there is nothing in Raed's substance use history that suggests an increased risk of nonappearance, noncompliance with conditions of release, or danger to the community. His longstanding abstinence instead removes a concern that can sometimes complicate successful pretrial supervision.

Criminal History

Raed has minor criminal history, but it mainly occurred thirty to thirty-five years ago with the most recent identified offense occurring approximately twenty years ago.

During the earlier years (1990's) of his involvement in convenience-store businesses, Raed was arrested on several occasions for selling alcohol or cigarettes to individuals who were under the legal age to purchase those products.

In 1996, Raed was convicted of aggravated assault arising from a dispute with an individual he had hired to repair refrigeration equipment at one of his stores. A disagreement developed concerning the cost of the repair, and Raed told the individual that he no longer wanted the work performed and asked him to leave. When the individual threatened to damage the compressor, Raed displayed a firearm and again told him to leave. Raed did not fire the weapon. He recognizes that introducing a firearm into the dispute was a serious mistake and regrets his

conduct. However, the severity of the incident was reflected by the severity of the court's punishment - Raed was placed on probation for one year and successfully completed the term of supervision.

Raed's most recent criminal matter occurred in 2006, when he was charged with misdemeanor battery. Adjudication was withheld, and he was ordered to pay a fine. No probation was ordered.

Raed has had no further criminal involvement during the approximately twenty plus years since that case.

*Analysis*

Raed's criminal history is relevant to the Court's consideration of his past conduct and criminal history under 18 U.S.C. § 3142(g)(3)(A). The 1996 aggravated assault is relevant because the conduct involved Raed's display of a firearm during a confrontation. That history cannot be disregarded. Its significance, however, should be considered in the context of both the circumstances of the incident and the substantial passage of time since it occurred.

The aggravated assault occurred approximately 30 years ago, when Raed was approximately 26 years old. He successfully completed the one-year term of probation imposed in that case, demonstrating that he has previously been subject to court-ordered supervision and completed it successfully. There is no subsequent weapons offense in his history.

Raed's only later identified criminal matter was the misdemeanor battery case in 2006, when he was approximately 36 years old. Adjudication was withheld, and the court imposed a fine. Approximately twenty years have now passed since that case without further identified criminal involvement.

The age and pattern of Raed's prior conduct provide important context. He is now 56 years old. Thirty years have elapsed since the aggravated assault involving the firearm, and approximately twenty years have elapsed since his last identified criminal matter of any kind. His record does not reflect repeated or escalating criminal conduct as he has grown older. Rather, the identified criminal history is concentrated in an earlier period of his adult life, followed by approximately two decades without further involvement in the criminal justice system.

Raed's successful completion of probation is also relevant to the question presently before the Court. His experience with court-ordered supervision provides some historical evidence that he can comply with requirements imposed by a court. That history is appropriately considered when assessing whether conditions can reasonably assure his compliance during the pendency of the present case.

Raed's prior record should also be considered as one component of the larger history-and-characteristics inquiry required by § 3142(g), rather than in isolation. His criminal history exists together with nearly four decades of residence in the Tampa Bay area, more than 36 years of marriage, home ownership, four surviving

adult children who live nearby, extensive extended family connections, approximately 28 years of continuous self-employment, and substantial business interests in the community.

The prior record presents a legitimate consideration for the court, but its remoteness, Raed's successful completion of probation, the absence of any subsequent identified weapons offense, and approximately twenty years without further identified criminal involvement provide important context in assessing what that history indicates about his present ability to comply with conditions of release.

*Whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state or local law*

The Defendant has minimal criminal history (four misdemeanor offenses of selling alcohol and cigarettes to minors that resulted in withholds of adjudications and probation and one felony aggravated assault that resulted in a withhold of adjudication and one year of probation – all that occurred thirty to thirty-five years ago - and one misdemeanor battery that occurred over twenty years ago that resulted in a withhold of adjudication and a fine), no history of failing to appear at court appearances, no violations of previous terms of pretrial release, no violations of previous impositions of probation.

*The nature and seriousness of the danger to any person or the community that would be posed by the person's release.*

The Defendant is not a danger to the community. In the light most favorable to the government, assuming the Defendant is guilty of this offense, and in no way is this an admission, but rather a point that is necessary to address, his actions were not directed toward the United States and involved $11,000 (or less than $50,000).

To offset any concern the court has about danger to the community, the Defendant offers that pretrial release terms and conditions may be fashioned by the court to assuage any remaining concerns. The Defendant discusses those options in the next section.

VII. Requested Conditions of Release

The Defendant respectfully leaves it to this Honorable Court to determine the conditions of release but urges this Honorable Court to grant release and fashion the least restrictive means of release as set forth by law. The Defendant further reserves the right to make humble and respectful suggestions during court proceedings in this matter.

VIII. Third Party Custodians

As stated in the September 16, 2026 United States Pretrial Services Report, the Defendant resides with his wife and his adult son in Lutz, Florida.

The Defendant's wife, Buthaina Yousef, and son, Khys Yousef, are willing to act as third-party custodians.

There are no guns in the home, and both proposed third party custodians are willing to install a land line if a monitoring system is so ordered as a term and condition of the Defendant's release. Both are willing to password protect the home's internet access and assure the court the Defendant will not have access to devices that can access the internet via cellular service.

On September 22, 2026, undersigned counsel provided United States Pretrial Services the contact information of both individuals offered as third party custodians. Both individuals were and remain willing to speak with United States Pretrial Services prior to the Defendant's September 23, 2026 detention hearing.

Both individuals will be present for the Defendant's September 23, 2026 detention hearing and both are willing to answer questions under oath propounded by the court on the responsibilities associated with being a third-party custodian and any other concerns the court has regarding the issue of detention versus pretrial release.

IX. Collateral

To secure a bond set by this court, the Defendant offers the following collateral:

Home
Seffner, Florida 33584
Estimated Value: $1,200,000
Mortgage Loan: $600,000
Estimated Equity: $600,000

Home
Tampa, Florida 33647
Estimated Value $700,000
Mortgage Loan $100,00
Estimated Equity: $600,000

Home
Lutz, Florida 33549
Estimated Value: $600,000
Mortgage Loan: $100,000
Estimated Equity: $500,000

Home
Lutz Florida 33559
Estimated Value: $600,000
Mortgage Loan: $132,000
Estimated Equity: $468,000

Home
Tampa, Florida 33647
Estimated Value $350,000
Mortgage Loan: None
Estimated Equity: $350,000

Home
Lutz, Florida 33548
Estimated Value: $1,000,000
Mortgage Loan: $700,000
Estimated Equity: $300,000

All these homes are resided in (along with other family members, including minors) by the people offering them as secured collateral for bond. Should these homes be seized due to the Defendant's failure to appear to a court appearance as ordered, the occupants of the homes, adults and minors, would be homeless. They all understand and accept this risk.

Undersigned counsel notes that he provided the full names, contact information, and the property addresses relevant to each of the above collateral offerings to United States Pretrial Services on September 22, 2026 for contact and inspection prior to the Defendant's September 23, 2026 detention hearing. Each person associated with each home is willing to speak with United States Pretrial Services *in advance* of the Defendant's September 23, 2026 detention hearing and will be present to answer any questions the court has under oath *during* the Defendant's September 23, 2026 detention hearing.

Additional information will be provided to the government and the court prior to and during the Defendant's September 23, 2026 detention hearing regarding these properties by United States Pretrial Services and undersigned counsel. This information was not enclosed in this pleading to protect the personal identification information of each person.

X. Position of the Government

In accordance with local rules, undersigned counsel ascertained the position of the government as to this motion.

The government objects to pretrial release.

XI. Position of United States Pretrial Services

United States Pretrial Services, as set forth in the Defendant's September 16, 2026 Pretrial Services Report, recommends pretrial release with the following conditions of release (all of which the Defendant has no disagreement):

- Report to Pretrial Services as directed, and
- Surrender passports to the Clerk of the Court[4] and do not obtain any new travel documents, and
- Travel restricted to the Middle District of Florida.

The Defendant offers for the court's consideration the following additional restrictions (should the court feel it appropriate to add terms and conditions to the proposed conditions of release above):

- A monetary bond secured by the properties listed above (with greater detail to be provided to the court during the September 23, 2026 detention hearing to protect the personal identification information of the persons offering collateral).
- Home Detention with a monitor, and
- No direct or indirect wi-fi or cellular internet access, and
- No direct or indirect wi-fi or cellular internet access to banking or financial accounts or applications (commonly referred to as "apps"), and

[4] The Defendant's United States of America and Jordan passports were seized by federal law enforcement on September 15, 2026.

- No direct or indirect wi-fi or cellular internet access to social media accounts or applications, and
- A prohibition on new possession or constructive possession of electronic devices with wi-fi or cellular internet service.

## CONCLUSION

WHEREFORE, the Defendant, RAED YOUSEF, by and through the undersigned counsel respectfully requests this Honorable Court grant the stated relief and/or any other relief this Honorable Court deems appropriate.

Respectfully submitted,

By: /s/ Mark J. O'Brien
Mark J. O'Brien, Esquire
Florida Bar No.: 0160210
511 West Bay Street
Suite 330
Tampa, Florida 33606
T: (813) 228-6989
E: mjo@markjobrien.com

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY on September 22, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will then send notice of electronic filing to all counsel of record.

By: /s/ Mark J. O'Brien
Mark J. O'Brien, Esquire