UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 8:26-cr-285-KKM-SPF

RAED YOUSEF
a/k/a Raed Mohamed Salim Suleiman

# UNITED STATES' BRIEF IN SUPPORT OF DETENTION

## INTRODUCTION

Money is the lifeblood of terrorism. And the defendant, Raed Yousef (who also goes by the alias Raed Mohamed Salim Suleiman), provided this lifeblood to Hamas, a designated terrorist organization and specially designated terrorist, time and time again. He should be detained pending trial for several reasons. First, sending money to a terrorist organization responsible for killing and kidnapping thousands of civilians, including United States citizens in multiple violent terrorist attacks over the years, is a serious crime that warrants detention to protect public safety and national security. In fact, the Bail Reform Act recognizes as much and imposes a presumption for detention in cases involving federal crimes of terrorism, like the charges the defendant faces here. The defendant also poses a serious risk of flight. His sentencing exposure (a guidelines range of 360 to life) gives him powerful incentive to flee, and his risk of flight is compounded by his overseas connections, his ability to obtain travel documents in multiple names, and his ties to an international network of individuals associated with a terrorist organization upon whom he may

rely to flee and conceal his whereabouts. And lastly, the defendant poses a grave danger to the community. He has incited others to "slaughter[]", "behead[]", and "cut… apart" Jewish individuals and directed other members of the Hamas financing network to destroy evidence.

No combination of conditions would militate against the foregoing risks and dangers because all the defendant needs is an internet connect to send money to Hamas, advocate for hate-motivated killings, and destroy evidence.

The defendant should be detained pending trial.

## BACKGROUND

The defendant was part of a Hamas financing network. In total, the defendant sent more than $45,000 to French Organization 1 via PayPal. And he did so, knowing the funds were intended for the Hamas Terrorist Organization. On September 15, 2026, a federal grand jury in the Middle District of Florida returned an indictment that charged the defendant with nineteen federal felony offenses, which can largely be grouped into four categories:

- Conspiracy and attempt to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § § 2339B(a)(1), 2339B(d) (Counts 1-6);

- Conspiracy and attempt to provide funds, goods, and services to a specially designated terrorist, in violation of 50 U.S.C. §§ 1701-1706 and 31 C.F.R. § 595.201 *et seq*. (Counts 7-12);

- Conspiracy to commit international money laundering and international money laundering with the intention of promoting a specific unlawful activity, in violation of 18 U.S.C. § 1956(a)(2) (Counts 13-18); and

- Passport Fraud, in violation of 18 U.S.C. § 1542 (Count 19).

On the same day, the defendant was arrested after landing in Tampa, Florida following more than a month-long stint in the Middle East. At the time of his arrest, pursuant to search warrants from his person, agents seized a Jordanian passport in the name Raed Mohamed Salim Suleiman (hereinafter, the "Suleiman identity"), a Jordanian family book—an official civil document issued to the head of a household that contains core family ties—in the Suleiman identity, a Jordanian conscription book—evincing the defendant's previous service in the Jordanian military—in the Suleiman identity, two iPhones, a U.S. passport in the Yousef identity, and $10,450.25 in U.S. currency. Agents also executed a search warrant at the defendant's house. There, agents found and seized, among other things, a second Jordanian passport in the Suleiman name, financial documents and ledgers, USB drives, ledgers for multiple businesses, bundles of cash totaling $75,000, notebooks in a foreign language, and a composition notebook for the Holy Land Foundation. Agents also found multiple firearms, including a P556, a 5.56 NATO SIG Saver TP002971, a Springfield Armory 9MM operator NM535982, a Mossberg Maverick Model 88 MV18793R shotgun, a Smith & Weston revolver, and a SM27H & Wesson Revolver AJR2330 MOD686, hundreds of rounds of ammunition.

## LEGAL STANDARD

**A. Eligibility for a Detention Hearing**

The Bail Reform Act of 1984 (the "Act") sets out the circumstances when a defendant may be detained pending trial. The goal of the act is to balance a defendant's fundamental interest in pretrial liberty with adequate protection of the community and the integrity of the judicial process. *United States v. Salerno,* 481 U.S. 739, 747 (1987). To accomplish this goal, the Act limits the circumstances under which detention may be sought. *Id*.

Under the Bail Reform Act, if the United States moves to detain a defendant, a detention hearing "shall" be held if the case involves a charged offense falling in one of five enumerated categories, 18 U.S.C. § 3142(f)(1)(A)–(E), or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimidate a witness or juror, *id*. § 3142(f)(2)(A)–(B). The required detention hearing "shall be held immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance." *Id*. § 3142(f)(2).

**B. Rebuttable Presumption of Detention**

For certain enumerated offenses, there is a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" one of the enumerated offenses. *Id.* § 3142(e)(3). As relevant here, the list of offenses that trigger the rebuttable presumption of detention includes "an offense listed in section

2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." *Id*. § 3142(e)(3)(C). One of the enumerated offenses in § 2332b(g)(5)(B) is "2339B (relating to providing material support to terrorist organizations)."

The presumption of detention shifts the burden of production to the defendant. And although most rebuttable presumptions found in the law disappear when any evidence is presented by the opponent of the presumption, the rebuttable presumption of § 3142(e) is not such a 'bursting bubble.'" *United States v. Garcia*, 801 F. Supp. 258, 261 (S.D. Iowa 1992) (citing *United States v. Jessup*, 757 F.2d 378, 383 (1st Cir. 1985)). To rebut the presumption of detention set forth in § 3142(e)(3), the defendant must come forward with evidence that he not pose a danger to the community or a risk of flight. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "Once a defendant has met his burden of production relating to these two factors, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.* The presumption remains as a factor to be weighed in recognition "that Congress has found that certain [offenders], as a general rule, pose special risks of flight [and danger]." *Garcia*, 801 F. Supp. at 261.

## C. The Bail Reform Act

At the detention hearing, detention is warranted if, on balance, the following

factors demonstrate that there are no conditions of release that would reasonably assure the appearance of the person as required by the Court and the safety of any person in the community:

> (1) the nature and circumstances of the offense charged, including whether the offense is . . . a Federal crime of terrorism . . .;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person; and,
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

*See* 18 U.S.C. § 3142(g). If the Government establishes that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the Defendant must be ordered detained. 18 U.S.C. § 3142(e)(1). The United States as well as the defense may proceed by proffering evidence subject to the discretion of the judicial officer presiding at the detention hearing. *United States v. Gaviria*, 828 F.2d 667, 669 (11th Cir. 1987).

## ARGUMENT

### A. A Detention Hearing is Warranted Under § 3143(f)

Several independent reasons warrant a detention hearing. First, a detention hearing is warranted under section 3142(f)(1)(A) because the defendant is charged with "an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed"—conspiring and attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C.

§ 2339B (Counts 1-6). Second, there is a serious risk that the defendant will flee, as explained later in this memorandum. 18 U.S.C. § 3142(f)(2)(a). And third, there is a "serious risk" that the defendant will "obstruct or attempt to obstruct justice." 18 U.S. § 3142(f)(2)(B).

### B. There is a Rebuttable Presumption for the Defendant, who is Charged with a Federal Crime of Terrorism

Because the grand jury returned an indictment charging the defendant with several federal crimes of terrorism—including conspiring to provide material support to a foreign terrorist organization and attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §2339B (Counts 1-6)—there is a rebuttable presumption of detention under § 3142(e)(3)(C). *See United States v. Al-Arian*, 280 F. Supp. 2d 1345, 1347 (M.D. Fla. 2003) (explaining that a rebuttable presumption exists when charged with a federal crime of terrorism); *see also United States v. Sheikh*, 994 F.Supp.2d 736, 739 (E.D.N.C. 2014) (holding that indictment charging material support to a designated terrorist organization triggers § 3142's presumption).

Given the danger posed by terrorism and those who support it, courts almost always detain defendants charged with providing material support to terrorists and terrorist groups, even where other factors militate against detention. *See, e.g.*, *United States v. Muhammed Momtaz Al-Azhari*, Case No. 20-mj-1518-AEP, Doc. 17 (detaining the defendant and finding that the bond conditions of home detention, supervision by a family member, and other conditions are inadequate to overcome the statutory

presumption when charged under § 2339B); *see also United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) (affirming detention of § 2339A defendant notwithstanding strong community ties and no criminal record); *United States v. Kurashev*, No. 2:21-CR-00040-KJM-1, 2023 WL 8358108, at *4 (E.D. Cal. Dec. 1, 2023) (detaining § 2339B defendant notwithstanding that he had no criminal history, had a positive employment history, and was a father of four young children); *Stone*, 608 F.3d at 950 (finding that "[w]hile only [two of five defendants] have prior criminal histories, courts have never required a prior criminal record before ordering detention" and holding that all five defendants charged with a crime of terrorism should be detained); *United States v. Salkicevic*, No. 15-CR-0060, 2015 WL 525556, at *3-*4 (N.D. Ill. Feb. 10,2015) (detaining § 2339A defendant who was employed with husband and four minor children); *Sheikh*, 994 F. Supp. 2d at 741 (detaining § 2339B defendant with no criminal record); *United States v. Ferdaus*, No. 11-10331, 2011 WL 5909547, at *7–9 (D. Mass. Nov. 28, 2011) (detaining § 2339B defendant with no criminal convictions); *United States v. Hassan*, No. 18-CR-603, 2021 WL 826253, at *3 (E.D.N.Y. Mar. 4, 2021) ("Even if I found the weight of the evidence favored defendant, the seriousness of the charged offenses and the nature of his foreign ties would outweigh that factor."); *United States v. Mehanna*, 669 F. Supp. 2d 160, 165-66 (D. Mass. 2009) (detaining § 2339A defendant despite record of compliance with court-imposed release conditions).

That typical approach should carry to this case. Accordingly, the defendant cannot overcome the presumption of detention.

### C. Each of the Section 3142(g) Factors Compel Detention

Even if the defendant were able to put forth enough evidence to rebut the presumption of detention, each of § 3142(g)'s factors would still compel detention.

1. *The Nature and Circumstances of the Offenses, Including Support of Terrorist Organizations and Fraud in Obtaining Passports, Warrant Detention*

The crimes alleged in the Indictment fall into two categories: (1) counts relating to financing Hamas—including charges for providing material support, providing funds to a specially designated terrorist, and international money laundering, and (2) passport fraud. Both warrant detention.

Starting with the Hamas financing counts. Section 3142(g) instructs this Court to consider "the nature and circumstances of the offense charged, including whether the offense" falls within one of the enumerated categories of offenses that Congress designated as especially serious: "a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." § 3142(g). The above categories, in Congress's judgment, capture "the most serious of crimes." *United States v. Salerno*, 481 U.S. 739, 747 (1987).

The nature of the charged offenses weighs heavily in favor of detention. The defendant is charged with nineteen felony offenses, at least six of which involve "the most serious of crimes." *Id*. The circumstances also weigh heavily in favor of detention. The indictment, which includes over 32 overt acts, lays out how the defendant was part of a Hamas financing network that sent money to Co-

Conspirator 2, a confirmed member of Hamas' military wing. This Hamas financing network began less than one week after the deadly October 7 attacks. These attacks resulted in the murder of 1,200 people (including 50 United States citizens), and the kidnapping of 250 more people (6 of which were United States citizens and one of whom died in captivity).

And the defendant did not mince words when he articulated what he wanted done with the money he sent. On one occasion, he told Co-Conspirator 3 that he spoke to Co-Conspirator 2 and

> that [Co-Conspirator 2] knows people over there in the ah…ah. I told him, I told him, let them then cut off heads and show the whole world, like what the fucking Jews are doing to us over there, but he didn't do anything, you know. You see, you need to frighten them and scare them so they can flee from our land, man! Then after they hit them, they need to behead them and show that on ah, on ah…social media, so they can be frightened and scare them to death.

On another occasion, the defendant told Co-Conspirator 3 that

> kindness doesn't work with those [Israelis]…they don't…you need to be very, very tough with them, the same way they are treating you, very tough, I mean you have to be very tough too. You…ah… I mean you have to cut off heads, cut... cut them apart. I mean, make one uh… [UI] with those… with those assholes.

And when talking about Jewish individuals, the defendant said "[t]hese people need to be slaughtered; they need to be slaughtered, to behead them and display their heads. One would hold their heads, one in this hand and another in the other hand and display their heads to frighten them so they leave our land, man."

Put simply, the defendant provided material support to Hamas—whose own charter calls for the destruction of Israel—and was motivated by his own desire to see

Israelis or Jewish individuals slaughtered, beheaded, and cut apart. This factor heavily supports detention.

The nature and circumstances of the passport fraud count, too, favor detention. For many years, the defendant has lived in the United States and enjoyed the benefits of United States citizenship in the Yousef identity. That includes, among other things, obtaining a United States passport—which gives the defendant visa-free access to more than 180 destinations (including Israel). Each time the defendant has applied for (or renewed) a United States passport, however, the defendant deliberately omitted the existence of his Sueliman identity. In fact, the United States it not aware of a single document submitted to by the defendant that the discloses his Sueliman identity.[1] The defendant's deceit also supports detention. After all, just as the defendant created a new identity to obtain United States citizenship and United States travel documents, he could create another identity, obtain other citizenship or travel documents, and disappear. *See, e.g.*, *United States v. Anagha Emeka Onuoha*, Case No. 8:25-cr-261-TPB-AAS, Doc. 47 (finding that the defendant's charged offenses, which include fraudulently acquiring documents to include a United States passport, warrants detention); *United States v. Carcamo Mejia*, Case No. 8:25-cr-475-KKM-SPF, Doc. 55 (revoking order of release where defendants had the "ability to create fake identifications"); *United States v. Miranda*, 2021 WL 493404, at *3 (N.D. Cal. Feb. 10, 2021) (explaining that an alien defendant's prior possession or use of

[1] This includes, the defendant's naturalization paperwork—which also does not include that he previously served in the Jordanian military.

fraudulent identity documents demonstrates his or her potential access to the same, should he or she prospectively decide to flee). This set of skills gives him the ability to flee and avoid punishment.

2. *The Immense Weight of the Evidence, Which Comes Mostly from the Defendant's Own Words, Favors Detention*

The weight of the evidence also favors detention. The volume of the evidence is staggering. It includes, among other evidence, (1) thousands of social media posts made advocating for violence and the destruction of Israel and propaganda disseminated by official Hamas channels while simultaneously seeking "charitable donations," (2) voice memos sent over encrypted messaging networks—explaining (among other things) that when discussing donations to French Organization 1 and Co-Conspirators 1 and 2, the defendant should use the word "bread,"(3) communications providing instruction to delete communications about the "bread," (4) communications with an online covert employee explaining that its important to know the received funds are called "bread," (5) messages explaining that donations were for the "true men" not just the "babies, public people or the needy ones," (6) a plethora of financial records, including detailed tracing of the cryptocurrency transactions—including to cryptocurrency accounts seized as being associated with Terrorist Financing by Israel, *see e.g.*, Administrative Seizure Order 1/25, Administrative Seizure Order 34/23, and Administrative Seizure Order 56/23 Amendment 2, and (7) the defendant's own travel documents in the Sueliman identity.

Much of this evidence is also corroborated by the post-arrest statements made by others in the conspiracy and evidence obtained in the post-arrest searches. Among other things, agents were told that "bread" is the secret word for "the resistance" or "H." When asked what "H" means, the individual confirmed that is Hamas. In the defendant's home, agents also bank records, bulk cash, and a pamphlet for the Holy Land Foundation—which was shut down after the organization and its former officers were convicted in 2008 of funneling more than $12 million to Hamas. Additionally, in all likelihood, the United States' evidence in this case will only get stronger. For example, during the defendant's arrest, the United States obtained the defendant's electronic devices pursuant to a federal search warrant. Seizing these devices will give the United States access (for the first time) to the defendant's own encrypted messages on multiple applications.

The strength of the United States' evidence also provides the defendant with a strong incentive to flee. If convicted, the defendant is facing a cumulative maximum sentence well over 100 years in prison, and a guidelines range of 360 months to life in prison. The weight of the evidence means there is a strong likelihood that the defendant will be convicted. This, coupled with the sentencing exposure that could send the defendant to jail for the remainder of his life, gives the defendant a powerful incentive to flee. Accordingly, this factor weighs in favor of detention.

3. *The defendant's History and Characteristics involve inciting violence against others and encouraging coconspirators to destroy evidence and support his detention.*

In evaluating the defendants' history and characteristics, the Bail Reform Act instructs the Court to consider "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). While the United States recognizes that many of these factors, including the defendant's community ties, employment, and family ties, cut against detention, other factors, including the defendant's character and criminal history, weigh in favor of detention and outweigh any community ties that may militate against detention.

First, and most fundamentally, the defendant has incited the murder Jewish individuals in a horrific manner. He repeatedly called for the "beheading" and "slaughtering" of the "fucking Jews." And as a former military operative with access to multiple unsecured firearms, the defendant also has the ability to carry out his desire of "slaughtering" Jewish individuals.

The defendant also has a history of deceit, which as explained above, began from the very moment he became a naturalized United States citizen. When the defendant was arrested, he had just returned from more than one month in the Middle East. Critically, though, when the defendant left the United States, he told border officers that he was traveling to Istanbul, Turkey. But the defendant's location data told a different story. Less than forty-eight hours after the defendant landed in the Middle East, the defendant was not in Turkey, but instead, in the West Bank—

where he stayed for one month, before going to finally going to Turkey at the end of August (where he only stayed for approximately two weeks). During the same interview, the defendant was asked about the Jordanian passport in the Sueliman identity which, at the time, he claimed was an "alias for business." But that wasn't true either. The Sueliman identity appears to be the defendant's true identity: it is the name that every single Jordanian document in the defendant's possession at the time of his arrest is in.

The defendant's character also suggests that there is a strong likelihood that the defendant will attempt to destroy evidence if released. The defendant clearly instructed another co-conspirator to "be very careful, be careful of those messages" and "delete them, I mean, one by one [as you send]. If you are chatting with anybody, or if you are sending anything, especially for that 'bread' thing. Be careful." The defendant also disclosed in encrypted messages that he locked messages with Co-Conspirator 2 when traveling so people in the United States (and others) would not be able to access those communications and see their contents. The risk that the defendant would destroy evidence if released from custody is heighted by the fact that some of the encrypted messaging platforms that the co-conspirators used to circulate propaganda are cloud-based applications, meaning that data on devices seized from the defendant can be digitally wiped remotely by the defendant by logging into their accounts on other devices and deleting the data. That heightened risk differentiates this case from cases supported principally by witness testimony or physical evidence seized by law enforcement—cases in which defendants might have

the intent to destroy evidence but lack the practical ability to do so. *United States v. DeGrave*, 539 F.Supp.3d 184, 207 (D.D.C. 2021) (finding serious risk that defendant who previously instructed others to delete texts and destroy evidence would "attempt to obstruct justice if he is released on bond"); *United States v. Rhodes*, 648 F.Supp.3d 801, 811 (E.D. Tex. 2022) (detaining defendant who deleted evidence of planned attack on the Capitol, "exhibit[ing] an extreme defiance to federal authority that raise[s] doubt as to Defendant's ability and willingness to comply with conditions of release").

While ordinarily the lack of criminal history weighs against detention, the defendant (who has not spent a single day in prison until now) is now suddenly facing a guidelines sentence of 360 months to life. This gives him an incredible incentive to flee. What's more, although the defendant has not been convicted of a crime, he does have multiple arrests—including arrests for violent conduct, including aggravated assault and battery. He also has previously been arrested for fraud—further demonstrating his ability to deceive others.

Lastly, the defendant has significant overseas travel and significant overseas connections, including family members who still reside in the West Bank. If the defendant were to flee to the West Bank, he could avoid prison altogether, as the West Bank will not extradite to the United States. That risk is compounded given the defendant's connections to the Hamas terrorist network—upon whom the defendant may rely on to flee and conceal his whereabouts. In fact, one of the defendant's co-conspirators, who mistakenly believes the defendant is still in the

Middle East, discussed having a family member warn the defendant not to return to the United States.

Taken together. the defendant's history and characteristics favor detention. *United States v. Bailey*, No. 8:25-CR-387-VMC-NHA, 2025 WL 2897026, at *4 (M.D. Fla. Oct. 10, 2025) (explaining that because the defendant "is deeply involved in extremist, hateful beliefs that he considers justification for violence….[t]he nature and circumstances of the offense favor detention")

4. *The defendant poses a danger to the community that cannot be mitigated by conditions of release.*

The defendant poses a danger to both the Tampa community and the world-wide community. As set forth in the Indictment, Hamas is committed to eliminating the state of Isreal through violent *jihad*. Hamas has not only directed its violence and terrorism against Israeli targets, but also attacked American citizens as part of its campaign to undermine Isreal's right to exist. In doing so, Hamas has murdered and injured thousands of people in its campaign of violence and terror.

The defendant has repeatedly advocated for the slaughtering of Jewish people, and the collection of firearms and hundreds of rounds of ammunition found in his home suggest he has the ability to do exactly that. Releasing the defendant would give him the ability to continue to donate funds to Hamas, recruit others to donate to Hamas, and recruit people all over the world to do the same. This weighs in favor of detention. *United States v. Musse*, 107 F. Supp. 3d 1012, 1015 (D. Minn. 2015) (detaining defendant in prosecution for terrorism charges, including conspiracy to

provide material support to a designated terrorist organization, finding that "the Defendant poses a risk of harm to the community" because he attempted to join a violent terrorist organization and, had he succeeded, he likely would have "reach[ed]back to Minnesota through social media to recruit other young men").

Placing restrictions on the defendant does not mitigate that danger. Unlike traditional criminals, whose danger to the community can be reduced by confining them in their homes, all the defendant needs is an internet connection to continue his criminal activity. Moreover, given the defendant's history of lies and attempts to obfuscate evidence of his crimes, the court can have no confidence that the defendant would comply with the restrictions. There are simply no conditions of release that can assure the defendant's appearance or the safety of the community.

## CONCLUSION

For reasons set forth above, the United States respectfully requests that the defendant be detained pending trial.

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By: */s/ Lindsey N. Schmidt*
Lindsey N. Schmidt
Assistant United States Attorney
United States Attorney No. 222
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Lindsey.Schmidt@usdoj.gov

**United States v. Raed Yousef** **Case No. 8:26-CR-285-KKM-SPF**

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Counsel of Record

*/s/ Lindsey N. Schmidt*
Lindsey N. Schmidt
Assistant United States Attorney
United States Attorney No. 222
400 N. Tampa St., Ste. 3200
Tampa, FL 33602-4798
Telephone: (813) 274-6000
Facsimile: (813) 274-6358
E-mail: Lindsey.Schmidt@usdoj.gov